UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL W. CURRY,<br><br>    Plaintiff,<br><br>    v.<br><br>FEDERAL BUREAU OF INVESTIGATION,<br>et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 18-0439 (EGS)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Legal Standard ................................................................................................................... 1

Argument ........................................................................................................................... 2

I.      DEFENDANTS CONDUCTED REASONABLE AND ADEQUATE
SEARCHES FOR RESPONSIVE RECORDS ................................................ 2

II.     DEFENDANTS PROPERLY INVOKED THE FOIA EXEMPTIONS ............... 6

        A.     FOIA Exemption 3 ................................................................................. 7

               1.    FBI'S Application of FOIA Exemption 3 ................................. 8

               2.    ATF'S Application of FOIA Exemption 3 ............................... 10

               3.    EOUSA'S Application of FOIA Exemption 3 ......................... 10

        B.     FOIA Exemption 5……………………………………………………11

               1.    FBI'S Application of FOIA Exemption 5 ............................... 14

               2.    EOUSA'S Application of FOIA Exemption 5 ......................... 16

        C.     FOIA Exemption 6 and 7………………………………………………..17

               1.    FBI'S Application of FOIA Exemption 6 and 7 ..................... 18

                      a.    Exemption (7)(A) ...................................................... 18

                      b.    Exemption 6 and 7(C) ............................................... 20

                      c.    Exemption 7(D) ......................................................... 31

                      d.    Exemption 7(E) ......................................................... 35

                2.    ATF'S Application of FOIA Exemption 6 and 7 ................... 46

                3.    EOUSA'S Application of FOIA Exemption 6 and 7 .............. 47

                4.    USMS' Application of FOIA Exemption 6 and 7 ................... 48

III.     DEFENDANTS RELEASED ALL RESPONSIVE, NON-EXEMPT,
SEGREGABLE RECORDS ........................................................................... 51

Conclusion ....................................................................................................................... 52

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*A. Michael's Piano, Inc. v. FTC,*
18 F.3d 138 (2d Cir.1994)................................................................................. 12

*Allen v. U.S. Secret Serv.,*
335 F. Supp. 2d 95 (D.D.C. 2004) ..................................................................... 2

*Am. Immigr. Lawyers Ass'n v. Exec. Off. for Immigr. Review,*
830 F.3d 667 (D.C. Cir. 2016)......................................................................... 22

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986).......................................................................................... 1

*Armstrong v. Exec. Off. of the President,*
97 F.3d 575 (D.C. Cir. 1996)........................................................................... 51

*Associated Press v. Dep't of Def.,*
549 F.3d 62 (2d Cir. 2008).............................................................................. 22

*Benjamin v. Dep't of State,*
178 F. Supp. 3d 1 (D.D.C. 2016) ...................................................................... 1

*Bigwood v. Dep't of Def.,*
132 F. Supp. 3d 124 (D.D.C. 2015) .................................................................. 2

*Billington v. Dep't of Just.,*
301 F. Supp. 2d 15 (D.D.C. 2004) .................................................................. 31

*Blackwell v. FBI,*
646 F.3d 37 (D.C. Cir. 2011) ..................................................................... 22, 35

*Boyd v. Crim. Div. of Dep't of Just.,*
475 F.3d 381 (D.C.Cir.2007)........................................................................... 19

*Burka v. Dep't of Health & Human Servs.,*
87 F.3d 508 (D.C. Cir. 1996) .......................................................................... 11

*Canning v. Dep't of Just.,*
567 F. Supp. 2d 104 (D.D.C. 2008) ................................................................ 51

*Canning v. Dep't of State,*
346 F. Supp. 3d 1 (D.D.C. 2018) ...................................................................... 3

*Carter v. Dep't of Com.*,
830 F.2d 388 (D.C. Cir. 1987) ........................................................................ 21, 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................ 1

*Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Labor*, .
478 F. Supp. 2d 77 (D.D.C. 2007) ......................................................................... 7

*Coastal States Gas Corp. v. Dep't of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ............................................................................. 11

*CREW v. Dep't of Just.*,
746 F.3d 1082 (D.C. Cir. 2014) ..................................................................... 19, 23

*CREW v. Dep't of Just.*,
870 F. Supp. 2d 70 (D.D.C. 2012) ....................................................................... 36

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
436 F. Supp. 3d 90 (D.D.C. 2019) ....................................................................... 14

*Ctr. for Nat'l Sec. Studies v. Dep't of Just.*,
331 F.3d 918 (D.C. Cir. 2003) ............................................................................. 19

*Dep't of Def. v. Fed. Labor Relations Auth. ("FLRA")*,
510 U.S. 487 (1994) ................................................................................................ 6

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
532 U.S. 1 (2001) ................................................................................................. 12

*Dep't of Just. v. Landano*,
508 U.S. 165 (1993) .............................................................................................. 32

*Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) ................................................................................................ 6

*Elliott v. Nat'l Archives & Records Admin.*,
Civ. A. No. 06-1246 (JDB), 2006 WL 3783409  (D.D.C. Dec. 21, 2006) ................................... 4

*Fischer v. Dep't of Just.*,
596 F. Supp. 2d 34 (D.D.C. 2009) ....................................................................... 31

*Fish & Wildlife Serv. v. Sierra Club, Inc.*,
141 S. Ct. 777 (2021) ........................................................................................... 13

*Hammouda v. Dep't of Just.,*
920 F. Supp. 2d 16 (D.D.C. 2013) ............................................................................ 19

*Hickman v. Taylor,*
329 U.S. 495 (1947) ................................................................................................. 12

*In re Lindsey,*
148 F.3d 1100 (D.C. Cir. 1998) ............................................................................... 12

*Jud. Watch, Inc. v. Dep't of Def.,*
847 F.3d 735 (D.C. Cir. 2017) ................................................................................. 13

*Jud. Watch, Inc. v. FDA,*
449 F.3d 141 (D.C. Cir. 2006) ................................................................................. 13

*Jud. Watch, Inc. v. Rossotti,*
285 F. Supp. 2d 17 (D.D.C. 2003) ............................................................................. 2

*Lasko v. Dep't of Just.,*
No. 10-5068, 2010 WL 3521595 (D.C. Cir. Sept. 3, 2010) ....................................... 4

*Lepelletier v. FDIC,*
164 F.3d 37 (D.C. Cir. 1999) ................................................................................... 21

*Levinthal v. FEC,*
219 F. Supp. 3d 1 (D.D.C. 2016) ............................................................................. 17

*Martin v. Off. of Special Counsel,*
819 F.2d 1181 (D.C.Cir.1987) ................................................................................. 12

*McCutchen v. Dep't of Health &Human Servs.,*
30 F.3d 183 (D.C. Cir. 1994) ..................................................................................... 6

*McGehee v. CIA,*
697 F.2d 1095 (D.C. Cir. 1983) ................................................................................. 2

*McRae v. Dep't of Just.,*
869 F. Supp. 2d 151 (D.D.C. 2012) ......................................................................... 47

*Media Rsch. Ctr. v. Dep't of Just.,*
818 F. Supp. 2d 131 (D.D.C. 2011) ........................................................................... 2

*Miller v. Dep't of Just.,*
872 F. Supp. 2d 12 (D.D.C. 2012) ........................................................................... 32

*Milton v. Dep't of Just.*,
783 F. Supp. 2d 55 (D.D.C. 2011) ........................................................... 21

*Morley v. CIA*,
508 F.3d 1108 (D.C. Cir. 2007) ............................................................... 7

*Nation Magazine, Wash. Bureau v U.S. Customs Serv.*,
71 F.3d 885 (D.C. Cir. 1995) ................................................................. 23

*NLRB v. Sears, Roebuck & Co.*,
421 U.S. 132 (1975) .............................................................................. 11

*Oglesby v. Dep't of Army*,
920 F.2d 57 (D.C. Cir. 1990) ................................................................. 2

*Parker v. Dep't of Just.*,
934 F.2d 375 (D.C. Cir. 1991) ............................................................... 31

*Perry v. Block*,
684 F.2d 121 (D.C. Cir. 1982) ............................................................... 3

*Physicians for Human Rights v. Dep't of Def.*,
675 F. Supp. 2d 149 (D.D.C. 2009) ........................................................ 3

*Pub. Citizen Health Rsch. Grp. v. FDA*, 1
85 F.3d 898 (D.C. Cir. 1999) ................................................................. 6

*Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*,
740 F.3d 195 (D.C. Cir. 2014) ............................................................... 18

*Reep v. Dep't of Just.*,
302 F. Supp. 3d 174 (D.D.C. 2018) ........................................................ 7

*Reps. Comm. for Freedom of the Press v. FBI*,
3 F.4th 350  (D.C. Cir. 2021) ................................................................. 13

*Rosenberg v. Dep't of Def.*,
342 F. Supp. 3d 62 (D.D.C. 2018) .......................................................... 14

*Roth v. Dep't of Just.*,
642 F.3d 1161 (D.C. Cir. 2011) ....................................................... 22, 31

*SafeCard Servs., Inc. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ............................................................. 2

*Santana v. Dep't of Just.*,
828 F. Supp. 2d 204 (D.D.C. 2011) .................................................................. 2

*Schrecker v. Dep't of Just.*,
349 F.3d 657 (D.C. Cir. 2003) ......................................................................... 23

*Sea Shepherd Conservation Soc'y v. IRS*,
208 F. Supp. 3d 58 (D.D.C. 2016) ................................................................... 17

*Spirko v. U.S. Postal Serv.*,
147 F.3d 992 (D.C. Cir. 1998) ........................................................................... 7

*Steinberg v. Dep't of Just.*,
23 F.3d 548 (D.C. Cir. 1994) ............................................................................. 3

*Sussman v. U.S. Marshals Serv.*,
494 F.3d 1106 (D.C. Cir. 2007) ....................................................................... 51

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997) ......................................... 11

*Jud. Watch, Inc. v. Dep't of Comm.*,
337 F. Supp. 2d 146 (D.D.C. 2004) ................................................................. 35

*United Am. Fin., Inc. v. Potter,*
531 F. Supp. 2d 29 (D.D.C. 2008) ................................................................... 19

*Weisberg v. Dep't of Just.*,
627 F.2d 365 (D.C. Cir. 1980) ........................................................................... 2

*Weisberg v. Dep't of Just.*,
705 F.2d 1344 (D.C. Cir. 1983) ......................................................................... 2

*West v. Spellings*,
539 F. Supp. 2d 55 (D.D.C. 2008) ..................................................................... 4

*Wolf v. CIA*,
473 F.3d 370 (D.C. Cir. 2007) ........................................................................... 6

## **Statutes**

18 U.S.C. § 3123(d) ........................................................................................... 8

28 USC §§ 533 .................................................................................................. 18

31 U.S.C. § 5319 ................................................................................................. 8

5 U.S.C. § 552(a) ........................................................................................................ 13, 20

5 U.S.C. § 552(b) ............................................................................................................... 6

5 U.S.C. § 552(b)(3) ........................................................................................................... 7

5 U.S.C. § 552(b)(5) ......................................................................................................... 11

5 U.S.C. § 552(b)(6) ......................................................................................................... 20

5 U.S.C. § 552(b)(7) ......................................................................................................... 17

5 U.S.C. § 552(b)(7)(A) .................................................................................................... 18

5 U.S.C. § 552(b)(7)(C) .................................................................................................... 22

5 U.S.C. § 552(b)(7)(D) .................................................................................................... 31

5 U.S.C. § 552(b)(7)(E) .................................................................................................... 35

## **Rules**

Fed. R. Civ. P. 26 ............................................................................................................. 12

Fed. R. Civ. P. 56 ............................................................................................................... 1

Fed. R. Crim. P. 6 .............................................................................................................. 8

Defendants, the Federal Bureau of Investigation ("FBI") and Christopher Wray, in his official capacity as the Director of the FBI (collectively, "Defendants") through undersigned counsel, hereby respectfully submit this memorandum of law in support of their motion for summary judgment in the above-captioned matter, arising from a Freedom of Information Act ("FOIA") request submitted by Plaintiff Daniel Curry ("Plaintiff").

## FACTUAL BACKGROUND

The factual and procedural background is fully set forth in Defendants' Statement of Material Facts Not in Genuine Dispute ("SUMF"), and the Declarations of Michael Seidel (Ex. A), Kathleene Molen, (Ex. LL), Adam Siple, (Ex. MM), and Kara Cain (Ex. NN).

## LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment must demonstrate an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has met its burden, the non-movant "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

"FOIA cases are typically and appropriately decided on motions for summary judgment." *Benjamin v. Dep't of State*, 178 F. Supp. 3d 1, 3 (D.D.C. 2016), *aff'd*, 2017 WL 160801 (D.C. Cir. Jan. 3, 2017) (quoting *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009)). A defendant is entitled to summary judgment in a FOIA case if it demonstrates that no material facts are in dispute, that it has conducted an adequate search for responsive records, and that each responsive record that it has located either has been produced to the plaintiff or is exempt from disclosure. *See, e.g.,*

*Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980).  To meet its burden, a defendant may rely on reasonably detailed and non-conclusory declarations.  *See, e.g., McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Santana v. Dep't of Just.*, 828 F. Supp. 2d 204, 208 (D.D.C. 2011); *Allen v. U.S. Secret Serv.*, 335 F. Supp. 2d 95, 97 (D.D.C. 2004).

<u>**ARGUMENT**</u>

I.  **DEFENDANTS CONDUCTED REASONABLE AND ADEQUATE SEARCHES FOR RESPONSIVE RECORDS**

Under FOIA, an agency is obligated to conduct a search that is "reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see also Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."); *Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 137 (D.D.C. 2011).  A reasonable search is one that covers those locations where responsive records are likely to be located.  *Oglesby*, 920 F.2d at 68.  To satisfy its obligation, "the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Id.*

A search is not inadequate merely because it failed to "uncover[] every document extant." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see also Bigwood v. Dep't of Def.*, 132 F. Supp. 3d 124, 135 (D.D.C. 2015) ("[T]he agency's search for records need not be exhaustive, but merely reasonable.  The proper inquiry is not whether there might exist additional documents possibly responsive to a request, but whether the agency conducted a search reasonably calculated to uncover relevant documents."); *Jud. Watch, Inc. v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) ("Perfection is not the standard by which the reasonableness of a FOIA search is

measured."). A search is inadequate only if the agency fails to "show, with reasonable detail, that the search method . . . was reasonably calculated to uncover all relevant documents." *Oglesby*, 920 F.2d at 68 (noting that an agency need not search every record system, but only those which it believes are likely to hold responsive records).

Accordingly, for a court evaluating an agency's search, the fundamental question is "whether the search for those documents was adequate," not "whether there might exist any other documents responsive to the request." *Steinberg v. Dep't of Just.*, 23 F.3d 548, 551 (D.C. Cir. 1994) (quoting *Weisberg v. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)); *see also Weisberg*, 705 F.2d at 1351 ("[T]he issue is not whether any further documents might conceivably exist but rather whether the government's search for responsive documents was adequate.") (quoting *Perry v. Block*, 684 F.2d 121, 128 (D.C. Cir. 1982)). The Court's inquiry, therefore, should focus on the method of the search, not its results. *See, e.g., Bigwood*, 132 F. Supp. 3d at 135 (explaining that the adequacy of the search is judged by appropriateness of the methods used to carry out the search rather than by fruits of the search). For a search to be adequate, the agency need not search all its records systems, but it "cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Oglesby*, 920 F.2d at 68. An agency that restricts its search to certain records systems must "explain in its affidavit that no other record system was likely to produce responsive documents." *Id*. Agencies do not need to use every possible search term, *Canning v. Dep't of State*, 346 F. Supp. 3d 1, 14 (D.D.C. 2018), and "there is no bright-line rule requiring agencies to use the search terms proposed in a FOIA request," *Physicians for Human Rights v. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009).

The agency bears the burden of demonstrating the adequacy of its search by providing a declaration setting forth the search terms and type of search performed, "and averring that all files likely to contain responsive materials . . . were searched." *Elliott v. Nat'l Archives & Records Admin.*, Civ. A. No. 06-1246 (JDB), 2006 WL 3783409, at *2 (D.D.C. Dec. 21, 2006) (quoting *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 313-14 (D.C. Cir. 2003)). "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs.*, 926 F.2d at 1200 (internal quotation marks omitted); *West v. Spellings*, 539 F. Supp. 2d 55, 60 (D.D.C. 2008). Once an agency has met its burden of demonstrating the adequacy of its search, the agency's position can be rebutted "only by showing that the agency's search was not made in good faith." *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993); *Elliott*, 2006 WL 3783409, at *3 (explaining that to satisfy his evidentiary burden, the plaintiff "must present evidence rebutting the agency's initial showing of a good faith search"). Speculative or hypothetical assertions are insufficient to raise a material question of fact with respect to the adequacy of an agency's search. *See, e.g., Lasko v. Dep't of Just.*, No. 10-5068, 2010 WL 3521595, at *1 (D.C. Cir. Sept. 3, 2010) (per curiam) (explaining that the adequacy of the search is not undermined by mere speculation that additional documents might exist); *Oglesby*, 920 F.2d at 67 n.13; *Elliott*, 2006 WL 3783409, at *3 (noting that speculative claims about the existence of other documents cannot rebut the presumption of good faith accorded to agency declarations).

In this case, Plaintiff submitted a FOIA request to Defendants seeking records concerning FBI file 91A-IP-95252. SUMF ¶ 1. The FBI's Record/Information Dissemination Section ("RIDS") conducted a search of the Central Records System ("CRS") and located the requested file. SUMF ¶ 24.

To locate CRS information, RIDS employs an index search methodology. SUMF ¶ 25 Index searches of the CRS are reasonably expected to locate responsive information within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval to serve its primary law enforcement and intelligence gathering functions. SUMF ¶ 25. Given the broad range of indexed information in terms of both time frame and subject matter that it can locate in FBI files, a search of the FBI automated indices available through Sentinel—the FBI's next generation case management system that became effective FBI-wide on July 1, 2012—is the mechanism RIDS employs to conduct CRS index searches. SUMF ¶¶ 20, 25.

In response to Plaintiff's request, RIDS conducted a CRS index search for potentially responsive records employing the Sentinel and Automated Case Support ("ACS") indices available through Sentinel. SUMF ¶¶ 18, 26. The FBI conducted a search of these indices using the following search term: "91A-IP-95252." SUMF ¶ 26. As a result of these search efforts, the FBI located the responsive file. SUMF ¶ 26.

Based on the above facts, it must be concluded that RIDS conducted a search reasonably calculated to locate the specific file responsive to Plaintiff's request. SUMF ¶ 27. First, given its comprehensive nature and scope, the CRS is the principal records system searched by RIDS, to locate information responsive to most FOIA and Privacy Act requests, because the CRS is where the FBI indexes information about individuals, organizations, events, and other subjects of investigative interest for future retrieval. SUMF ¶ 27.  Second, given Plaintiff's request seeking information about FBI file 91A-IP-95252, such information would reasonably be expected to be in the CRS via the index search methodology. SUMF ¶ 27. Finally, the FBI located the file Plaintiff requested. SUMF ¶ 26. Specifically, the FBI identified a total of 8,224 responsive pages. SUMF ¶ 13. 1,885 pages were released in full, 2,793 pages were released in part, and 3,546 pages were

withheld in full. SUMF ¶ 13. Thus, the FBI has met its burden of demonstrating that it conducted a reasonable search and is entitled to judgment as to this issue. *See Elliott*, 2006 WL 3783409, at *2.

## II.   DEFENDANTS PROPERLY INVOKED THE FOIA EXEMPTIONS[1]

FOIA does not allow the public to have unfettered access to government files. *McCutchen v. Dep't of Health & Human Servs.*, 30 F.3d 183, 184 (D.C. Cir. 1994). Although disclosure is the dominant objective of FOIA, there are several exemptions to the statute's disclosure requirements. *Dep't of Def. v. Fed. Labor Relations Auth. ("FLRA")*, 510 U.S. 487, 494 (1994). FOIA requires that an agency release all records responsive to a properly submitted request unless such records are protected from disclosure by one or more of FOIA's nine exemptions. 5 U.S.C. § 552(b); *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150-51 (1989). To protect materials from disclosure, the agency must show that they come within one of FOIA's exemptions. *Pub. Citizen Health Rsch. Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007).

---

[1]     Unless a Privacy Act exemption applies, the Privacy Act provides individuals a right of access to records maintained in government files pertaining to them. *See* 5 U.S.C. § 552a. Exemption (j)(2) exempts from mandatory disclosure systems of records "maintained by an agency or component thereof which performs as its principal function any activity pertaining to the enforcement of criminal laws, including police efforts to prevent, control, or reduce crime or to apprehend criminals[.]" 5 U.S.C. § 552a(j)(2). The FBI has exempted law enforcement investigative records maintained in the CRS from the Privacy Act's disclosure requirements pursuant to Exemption (j)(2). *See* 63 Fed. Reg. 8671, 8684 (Feb. 20, 1998); *see also* 28 C.F.R. § 16.96(a)(1). Under Exemption (j)(2) of the Privacy Act, Plaintiff is not entitled to access these records, so any access rights are governed by FOIA. *See* 5 U.S.C. § 552a(b)(2) (the Privacy Act never prohibits a disclosure that FOIA requires). Thus, the FBI processed the records at issue under the access provisions of FOIA to achieve maximum disclosure. SUMF ¶ 28–29. The FBI is also forced to withhold records under a court order. SUMF ¶ 86.

Although a *Vaughn* index is a common device used by agencies to meet their burden of proof as to the applicability of an exemption, "the Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 998 n.4 (D.C. Cir. 1998) ("The form of the *Vaughn* index is unimportant and affidavits providing similar information can suffice.") (citing *Gallant v. NLRB*, 26 F.3d 168, 172-73 (D.C. Cir. 1994)).

## A.    FOIA Exemption 3

FOIA Exemption 3 exempts from disclosure records when they are specifically exempted from disclosure by statute . . . if that statute (A)(i) requires that the matter be withheld from the public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular criteria from withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the Open FOIA Act of 2009, specifically cites to this paragraph. 5 U.S.C. § 552(b)(3); *Reep v. Dep't of Just.*, 302 F. Supp. 3d 174, 183 (D.D.C. 2018), *aff'd*, No. 18-5132, 2018 WL 6721099 (D.C. Cir. Dec. 18, 2018).  Thus, the sole issue for decision "is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Morley v. CIA,* 508 F.3d 1108, 1126 (D.C. Cir. 2007).

### 1.   FBI'S Application of FOIA Exemption 3

The FBI asserted FOIA Exemption Category (b)(3) to information exempted pursuant to (1) 18 U.S.C. § 3123(d) (the Pen Register Act); (2) Federal Rule of Criminal Procedure 6(e) (Federal Grand Jury Information); and (3) 31 U.S.C. § 5319 (the Bank Secrecy Act). SUMF ¶¶ 32–35.

The FBI asserted FOIA Exemption Category (b)(3) to protect pen register information specifically exempted pursuant to 18 U.S.C. § 3123(d), the Pen Register Act, which protects from disclosure information pertaining to certain court "order(s) authorizing or approving the installation and use of a pen register or a trap and trace device;" and information pertaining to "the evidence of the pen register or trap and trace device or the existence of the investigation." SUMF ¶ 32. A pen register is a device that records phone numbers dialed to or from a target telephone. SUMF ¶ 32. The statute mandates that a court order be obtained prior to installing or using a pen register, unless the user of the telephone consents to the device. SUMF ¶ 32. Orders for pen registers are sealed unless otherwise ordered by the court. SUMF ¶ 32. Exemption (b)(3) protects the court order in its entirety; the identity of the individual on whom it is placed; the location of the device; information obtained from the device; and any other specifics regarding the pen register/trap and trace device. SUMF ¶ 32. Where documents at issue contain information that if disclosed would reveal the existence of use of a pen register or trap and trace device, or reveal the existence of an investigation involving a pen register or trap and trace device, that information is protected from disclosure by Exemption 3. SUMF ¶ 32. As relevant to 5 U.S.C. § 552 (b)(3)(B), the Pen Register Act is a statute enacted before the date of enactment of the OPEN FOIA Act of 2009. SUMF ¶ 32.

Specifically, the information withheld from disclosure pursuant to the Pen Register Act consists of: the identities and phone numbers of the individuals targeted by the pen registers and/or individuals whose information was collected due to their contacting the targets of the pen registers; the location of the pen register devices; information gathered by the devices; and court documents relating to the approval of the pen registers. SUMF ¶ 33. Accordingly, the FBI properly applied Exemption 3 to withhold information, because it is precluded from disclosing such information pursuant to 18 U.S.C. § 3123. SUMF ¶ 33.

Next, the FBI asserted FOIA Exemption Category (b)(3) to protect Federal Grand Jury Information pursuant to Federal Rule of Criminal Procedure 6(e). SUMF ¶ 34. It is well established Rule 6(e) embodies a broad, sweeping policy of preserving the secrecy of grand jury material regardless of the substance in which the material is contained. SUMF ¶ 34. Records responsive to Plaintiff's request details information about one or more federal grand juries empaneled in relation to the investigation at issue. SUMF ¶ 34. Specifically, the investigative records contain information about the names of recipients of federal grand jury subpoenas; information that identifies specific records subpoenaed by a federal grand jury; and copies of specific records provided to a federal grand jury in response to federal grand jury subpoenas. SUMF ¶ 34. Wherever the FBI protected this information, it found a clear nexus to federal grand jury proceedings on the face of the responsive documents, and any disclosure of this information would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of a federal grand jury, which the FBI is precluded from disclosing. SUMF ¶ 34.Thus, the FBI properly withheld this information pursuant to Exemption (b)(3), in conjunction with Rule 6(e). SUMF ¶ 34.

Finally, the FBI asserted FOIA Exemption Category (b)(3) to protect information pursuant to the Bank Secrecy Act ("BSA"). SUMF ¶ 35. Within the responsive material there exists

information obtained through the BSA during criminal investigative activities. SUMF ¶ 35. The FBI obtained this information from FinCEN. SUMF ¶ 35. The BSA provision located at 31 U.S.C. § 5319 provides that "a [BSA] report and records of reports are exempt from disclosure under section 552 of Title 5." SUMF ¶ 35. Pursuant to this statutory authority, FinCEN promulgated a regulation, found at 31 C.F.R. § 103.54, which specifically exempts BSA records from FOIA disclosure. SUMF ¶ 35. The FBI is statutorily prohibited from releasing any details regarding the information withheld in these records. SUMF ¶ 35. Therefore, the FBI properly asserted Exemption 3, in conjunction with 31 U.S.C. § 5319, to protect this information. SUMF ¶ 35.

### 2.    ATF'S Application of FOIA Exemption 3

The FBI consulted with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") concerning Bates-numbered pages: 1034-1037, 5716, 5945-5948. SUMF ¶ 97. ATF requested that information be protected pursuant to FOIA Exemptions 3. SUMF ¶ 97. All the documents referred to ATF by the FBI contained information pertaining to specific firearms traces conducted by ATF's National Tracing Center through information maintained in the ATF's Firearms Trace System database. SUMF ¶ 99. Congress expressly barred federal agencies from using appropriated funds to publicly disclose "part or all of the contents of the Firearms Trace System database maintained by the National Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives," Public Law 112-55, (125 Stat. 552), and therefore ATF properly instructed FBI to withhold firearms trace information under Exemption 3 of the FOIA. SUMF ¶ 99.

### 3.    EOUSA'S Application of FOIA Exemption 3

The FBI also consulted with the Executive Office for United States Attorneys ("EOUSA") concerning Bates-numbered pages: 387-390, 449-450, 461-465, 471, 587-590, 1055-1059, 1114-1116, 1246-1249, 1378, 1380-1382, 1396-1397, 3044-3051, 3084-3085, 3102-3103, 3117-3122,

3647, 3768, 3939, 3966, 4070, 4071, 4095-4103, 4872, 4939, 4940, 4975, 5140, 6136, 6137, 6164, 6304, 6329-6330, 6332, 6362-6371, 6375-6381. SUMF ¶ 103. EOUSA requested that information be protected pursuant to FOIA Exemption (b)(3). SUMF ¶ 103. Specifically, the Federal Rules of Criminal Procedure 6(e)(2)(B) necessitates the withholding of certain records pertaining to grand jury materials. SUMF ¶ 104. The documents that are specifically being protected by FOIA Exemption (b)(3) are grand jury notices of disclosure and grand jury forfeiture notices. SUMF ¶ 104. Thus, these records are properly exempted, and identified in the Vaughn Index. SUMF ¶ 104.

## B.    FOIA Exemption 5

Exemption 5 protects from disclosure "inter-agency or intra-agency memorand[a] or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  "[T]he parameters of Exemption 5 are determined by reference to the protections available to litigants in civil discovery; if material is not available in discovery, it may be withheld from FOIA requesters." *Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 516 (D.C. Cir. 1996) (internal quotation marks omitted); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975).  Federal government agencies may avail themselves of civil discovery privileges to withhold information otherwise responsive to a FOIA request.  *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980).

"Exemption 5 protects, as a general rule, materials which would be protected under the attorney-client privilege[.]" *Coastal States*, 617 F.2d at 862 (citing *Mead Data Cent., Inc. v. Dep't of Air Force,* 566 F.2d 242, 252–55 (D.C. Cir. 1977)).  For example, "confidential communications from clients to their attorneys made for the purpose of securing legal advice," *Tax Analysts v. IRS,* 117 F.3d 607, 618 (D.C. Cir. 1997) (citing *In re Sealed Case,* 737 F.2d 94, 98–99 (D.C. Cir. 1984)),

can be protected under Exemption 5. "In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer." *In re Lindsey,* 148 F.3d 1100, 1104 (D.C. Cir. 1998) (per curiam) (quoting *Tax Analysts,* 117 F.3d at 618) (additional citation omitted).

Exemption 5 also applies to the work product doctrine, which shields materials "prepared in anticipation of litigation or for trial by or for [a] party or by or for that . . . party's representative (including the . . . party's attorney, consultant, . . . or agent)." Fed. R. Civ. P. 26(b)(3); *see also Hickman v. Taylor,* 329 U.S. 495 (1947); *Tax Analysts,* 117 F.3d at 620. The work product doctrine protects deliberative materials but it also protects factual materials prepared in anticipation of litigation. *See, e.g., Martin v. Off. of Special Counsel,* 819 F.2d 1181, 1184-87 (D.C.Cir.1987); *A. Michael's Piano, Inc. v. FTC,* 18 F.3d 138, 147 (2d Cir.1994); *Tax Analysts,* 117 F.3d at 620. Rule 26(b)(3) allows discovery of materials prepared in anticipation of litigation only upon a showing of "substantial need," but in all cases "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney ... concerning the litigation." *Tax Analysts,* 117 F.3d at 620, n.11. The point of the rule is that while all materials prepared in anticipation of litigation are work product and protected from discovery by other parties, a sufficient showing of need may overcome that protection with respect to factual materials, but not with respect to deliberative materials. *Id.* This does not mean that factual materials are not work product; it means only that they receive a lower degree of protection under the Federal Rules than deliberative work product. *Id.*

Exemption 5 also applies to the deliberative process privilege, which "covers 'documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which [g]overnment decisions and policies are formulated[.]'" *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (citing *Sears,* 421 U.S. at 150). The privilege assures

- 12 -

agency staff that they can provide their candid opinions and recommendations to decisionmakers without fear of ridicule or reprisal. *Coastal States*, 617 F.2d at 866.  It also protects policymakers from premature disclosure of their proposals before they have been completed or adopted. *Id*. And it guards against "confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Id*.

The goal of the deliberative process privilege is to "prevent injury to the quality of agency decisions." *See Sears*, 421 U.S. at 151; *see also Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021).  The privilege "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options," as well as an "understanding that employees would be chilled from such rigorous deliberation if they feared it might become public." *Jud. Watch, Inc. v. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir. 2017).

The privilege may only be invoked for documents that are both predecisional and deliberative. *Sierra Club*, 141 S. Ct. at 785-786.  A document is predecisional if it was "generated before the agency's final decision on the matter[.]" *Id*. at 786; *see Coastal States*, 617 F.2d at 866. A document is deliberative when it is "prepared to help the agency formulate its position[,]" *Sierra Club*, 141 S. Ct. at 786, and it "reflects the give-and-take of the consultative process[,]" *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (quoting *Coastal States*, 617 F.2d at 866).

In addition, to survive summary judgment, the agency must demonstrate that it is reasonably foreseeable that release of those materials would cause harm to an interest protected by that privilege.  *See* 5 U.S.C. § 552(a)(8)(A)(i)(I); *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021).  The foreseeable harm requirement "impose[s] an independent

and meaningful burden on agencies." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019) (citation omitted).  While agencies may sometimes satisfy that burden on a category-by-category basis rather than a document-by-document basis— "that is, group together like records" and explain the harm that would result from release of each group—the basis and likelihood of that harm must be independently demonstrated for each category.  *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018).  In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure "would"—not "could"—adversely impair internal deliberations.  *Reps. Comm.*, 3 F.4th at 369–70 (citing *Machado Amadis*, 971 F.3d at 371).

### 1.    FBI'S Application of FOIA Exemption 5

The FBI asserted FOIA Exemption Category (b)(5) pursuant to the deliberative process privilege. SUMF ¶ 36. The FBI relied on Exemption 5 and the deliberative process privilege to protect draft documents, as well as handwritten notes drafted by FBI Special Agents during the interview of third parties and handwritten notes reflecting analysis of bait money. SUMF ¶ 37. All these documents are both pre-decisional and deliberative and were exchanged within the FBI as part of the investigation. SUMF ¶ 37. These materials reflect initial impressions and deliberations integral to reaching final agency decisions or were key to a decision making process aimed at furthering the investigation. SUMF ¶ 37. Additionally, in compliance with the FOIA Improvement Act of 2016, all this material was created less than 25 years before the submission of Plaintiff's request. SUMF ¶ 37.

The FBI asserted Exemption 5, deliberative process privilege, to withhold draft documents. SUMF ¶ 38. Draft documents are inherently part of the deliberative process. SUMF ¶ 38. In the instances where the FBI withheld draft material pursuant to Exemption 5, the FBI found the draft

material was shared inter-agency, was pre-decisional (predated the final product), was deliberative (the material was shared to solicit feedback/edits), and release could potentially harm agency deliberations. SUMF ¶ 38. The reasonably foreseeable harm here would be a chilling effect on agency employees' willingness to share such drafts if they knew their unrefined ideas would be subject to public disclosure. SUMF ¶ 38. Furthermore, there would be a risk of public confusion in that these drafts do not final agency decisions. SUMF ¶ 38.

The FBI also asserted Exemption 5, deliberative process privilege, to withhold handwritten notes. SUMF ¶ 39. The handwritten notes at issue herein are draft documents containing the special agent's shorthand notes of thoughts, ideas, impressions, and interpretations of the verbal interview of third-party individuals. SUMF ¶ 39. They are inherently deliberative in nature as the informal documentation does not always appear verbatim in the final interview record. SUMF ¶ 39. The thoughts, ideas, and impressions contained in the handwritten interview notes at issue here were edited and distilled during the editorial process for the creation of the final agency decision – the FD-302; hence its pre-decisional nature. SUMF ¶ 39. The FBI processed and released to Plaintiff the responsive portions of the final FD-302s corresponding to the handwritten notes. SUMF ¶ 39. The handwritten notes reflecting the Special Agents initial thoughts and analysis of the bait money were also withheld because they contain preliminary reflections of the evidence, subject to further analysis in the investigation. SUMF ¶ 39. All these documents are both pre-decisional and deliberative and were exchanged within the FBI as part of the investigation. SUMF ¶ 39. These materials reflect initial impressions and deliberations integral to reaching final agency decisions or were key to a decision making process aimed at furthering the investigation. SUMF ¶ 39.

The reasonably foreseeable harm that would result from disclosure here would be to the deliberate process privilege. SUMF ¶ 40. First, release of the draft handwritten notes would have

a chilling effect on special agents' willingness to document and share comprehensive interview notes or handwritten analysis notes of evidence if they knew that unrefined investigative notes, strategies, reflected in the notes would be subject to disclosure. SUMF ¶ 40. Second, release of the draft handwritten notes would reveal special agents' internal deliberations and sorting of multitude of ideas and at times, investigative strategies considered at time of the interview or review of the evidence, but later determined not relevant or ineffective. SUMF ¶ 40. Third, release of these handwritten notes would create public confusion as it will reveal information noted in the draft handwritten notes later determined not necessary for inclusion in the final agency FD-302 or where evidence was not deemed relevant. SUMF ¶ 40. Accordingly, the FBI properly withheld this information pursuant to Exemption 5. SUMF ¶ 40. Additionally, in compliance with the FOIA Improvement Act of 2016, the records at issue were created less than 25 years before the submission of Plaintiff's request. SUMF ¶ 40.

Thus, the FBI properly protected draft documents as well as handwritten notes described under Exemption 5, in conjunction with the deliberative process privilege. SUMF ¶ 41. The FBI endeavored to segregate non-deliberative facts, whenever possible, and only withheld such material when it found it was inextricably intertwined with agency deliberations. SUMF ¶ 41.

## 2. EOUSA'S Application of FOIA Exemption 5

Based on the FBI's consultation with EOUSA, EOUSA also requested that information be protected pursuant to FOIA Exemption (b)(5). SUMF ¶ 103. Specifically, attorney work-product privilege is being asserted to protect communications regarding the Southern District of Indiana's intent to file a forfeiture action. SUMF ¶ 105. The various letters were drafted in anticipation of forfeiture litigation action. SUMF ¶ 105. This is precisely the type of information Exemption 5 was designed to protect under the attorney-work product privilege. SUMF ¶ 105.

The information being withheld from disclosure pursuant to the deliberative process privilege includes communications between the Southern District of Indiana and FBI regarding the potential filing of forfeiture actions. SUMF ¶ 106. It would be harmful to release the communications, thoughts, ideas, and strategies of government attorneys contemplating the initiation of a forfeiture action. SUMF ¶ 106. One specific concern in forfeiture actions is releasing the locations and items the government is considering seizing. SUMF ¶ 106. Release of such information impedes future forfeiture actions. SUMF ¶ 106. Thus, EOUSA properly protected documents pursuant to Exemption 5. *See id.*

### C.    FOIA Exemption 6 and 7

To establish the applicability of any subparts of FOIA Exemption 7, the government must first show that the records at issue were "compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7). The D.C. Circuit "has long emphasized that the focus is on how and under what circumstances the requested files were compiled, . . . and 'whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'" *Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d 58, 79 (D.D.C. 2016) (quoting *Jefferson v. Dep't of Just.*, 284 F.3d 172, 177 (D.C. Cir. 2002)) (additional citations omitted). A record is "compiled for law enforcement purposes" within the meaning of Exemption 7 "so long as there is (1) a rational 'nexus' between the record and the agency's law enforcement duties, and (2) a connection between the subject of the record and a possible security risk or violation of federal law." *Levinthal v. FEC*, 219 F. Supp. 3d 1, 6 (D.D.C. 2016) (citing *Campbell v. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998)). Further, where, as here, "the agency's principal function is law enforcement, courts are 'more deferential' to the agency's claimed purpose for the particular records." *Pub. Emps. for*

*Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 203 (D.C. Cir. 2014) (quoting *Tax Analyst v. IRS*, 294 F.3d 71, 77 (D.C. Cir. 2002)).

Pursuant to 28 USC §§ 533, 534, and Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM) and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. SUMF ¶ 42. Under this investigative authority, the responsive records herein were compiled in furtherance of the FBI's investigation of Daniel Curry. SUMF ¶ 42. Mr. Curry was suspected to be involved in approximately 10 bank robberies. SUMF ¶ 42. In May 2006 Mr. Curry was indicted in four of these bank robberies and in March 2007, Mr. Curry was found guilty on all eight counts brought against him in the aforementioned indictment. SUMF ¶ 42. Considering these records were compiled to document the FBI's investigation of potential crimes, the FBI determined they were compiled for law enforcement purposes. SUMF ¶ 42.

### 1.    FBI'S Application of FOIA Exemption 6 and 7

#### a.    Exemption (7)(A)

The FBI withheld certain information pursuant to FOIA Exemption 7(A). SUMF ¶ 73. Exemption (7)(A) allows agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings[.]" 5 U.S.C. § 552(b)(7)(A).

"Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" *CREW v. Dep't of Just.*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). "To justify withholding, [an agency] must therefore demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'" *Id.* (quoting *Mapother v. Dep't of Just.*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)). "Exemption 7(A) does not require a presently pending 'enforcement proceeding.' Rather . . . it is sufficient that the government's . . . investigation is likely to lead to such proceedings." *Ctr. for Nat'l Sec. Studies v. Dep't of Just.*, 331 F.3d 918, 926 (D.C. Cir. 2003).

To support its Exemption 7(A) withholdings, "the government's affidavit must provide information that 'explain[s] to the district court how the release . . . would interfere with enforcement proceedings,' in contrast to a bare assertion that an enforcement action would be harmed by disclosure." *United Am. Fin., Inc. v. Potter,* 531 F. Supp. 2d 29, 38 (D.D.C. 2008) (quoting *Sussman,* 494 F.3d at 1114) (other citation omitted) (alterations in original). Hence, "[t]he government meets its burden by demonstrating that release of the requested information would reveal 'the size, scope and direction of [the] investigation' and thereby 'allow for the destruction or alteration of relevant evidence, and the fabrication of fraudulent alibis.'" *Boyd v. Crim. Div. of Dep't of Just.,* 475 F.3d 381, 386 (D.C.Cir.2007) (quoting *Alyeska Pipeline Serv. Co. v. EPA,* 856 F.2d 309, 312 (D.C.Cir.1988)) (alteration in original); *see also Hammouda v. Dep't of Just.*, 920 F. Supp. 2d 16, 23-24 (D.D.C. 2013).

In addition, to survive summary judgment, Defendant must demonstrate that it is reasonably foreseeable that release of those materials would cause harm to an interest protected by

the exemption. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I).  The foreseeable harm requirement "impose[s] an independent and meaningful burden on agencies." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (citation omitted). While agencies may sometimes satisfy that burden on a category-by-category basis rather than a document-by-document basis—"that is, group together like records" and explain the harm that would result from release of each group—the basis and likelihood of that harm must be independently demonstrated for each category. *Rosenberg*, 342 F. Supp. 3d 62 at 78.

Often, the FBI asserts Exemption 7(A) categorically to withhold a variety of different documents in an investigative file, which the FBI then groups into functional categories and describes in greater detail. SUMF ¶ 43. In this case, however, the FBI asserted Exemption 7(A) in a limited fashion to protect a pending investigative FBI File number within the responsive records. SUMF ¶ 43. The release of this information would reveal unknown information concerning pending enforcement procedures, to include the existence of unknown investigations. SUMF ¶ 43. The FBI determined release of any of this material would provide criminals with information about the government's investigation/enforcement strategies in ongoing matters, allow them predict and potentially thwart these strategies, and/or allow them to discover/tamper with witnesses and/or destroy evidence. SUMF ¶ 43. As such, revealing this information could reasonably be expected to interfere with pending enforcement proceedings. SUMF ¶ 43. Thus, the FBI has properly applied Exemption 7(A) to protect this information. SUMF ¶ 43.

### b.     Exemption 6 and 7(C)

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The Supreme Court has interpreted the phrase 'similar files' to include all information that applies to a

particular individual." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999). "The information in the file 'need not be intimate' for the file to satisfy the [Exemption 6] standard, and the threshold for determining whether information applies to a particular individual is minimal." *Milton v. Dep't of Just.*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011) (quoting *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc)).

Once across the low threshold that the information at issue "applies to a particular individual," the analysis shifts to whether disclosure of the information at issue "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 requires an agency to balance the individual's right to privacy against the public's interest in disclosure. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976). Accordingly, the agency must determine whether disclosure of the information threatens a protectable privacy interest; if so, the agency must weigh that privacy interest against the public interest in disclosure, if any. *See Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

The "only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would serve the core purpose of FOIA, which is contribut[ing] significantly to public understanding of the operations or activities of the government." *FLRA*, 510 U.S. at 495 (internal citation omitted). Plaintiff bears the burden of demonstrating that the release of the withheld documents would serve this interest. *Carter v. Dep't of Com.*, 830 F.2d 388, 390-92 nn. 8, 13 (D.C. Cir. 1987). The "simple invocation of a legitimate public interest . . . cannot itself justify the release of personal information. Rather, a court must first ascertain whether that interest would be served by disclosure." *Hopkins v. HUD*, 929 F.2d 81, 88 (2d Cir. 1991); *see also Carter*, 830 F.2d at 391 and n.13 (establishing public interest is the requester's burden); *Favish*, 541 U.S.

157, 172 (2004) (stating that, with respect to privacy concerns, the requesting party must show a "sufficient reason for the disclosure").

FOIA Exemption 7(C) protects "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "Exemption 7(C) . . . is 'somewhat broader' than Exemption 6, which requires proof of a 'clearly unwarranted invasion of personal privacy.'" *Roth v. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011). Where the information in question was compiled for law enforcement purposes, courts "have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)." *Id.* Under both Exemptions 6 and 7(C), the agency must engage in a balancing test to determine whether the public interest in disclosure is outweighed by a significant private interest in non-disclosure. *See Am. Immigr. Lawyers Ass'n v. Exec. Off. for Immigr. Review*, 830 F.3d 667, 673–74 (D.C. Cir. 2016).

The burden is on Plaintiff to establish that disclosure of this information would otherwise sufficiently serve the public interest to overcome the individuals' privacy interests. *See, e.g., Carter v. Dep't of Com.*, 830 F.2d 388, 391 n.13 (D.C. Cir. 1987); *accord Associated Press v. Dep't of Def.*, 549 F.3d 62, 66 (2d Cir. 2008); *Salas v. Off. of Inspector Gen.*, 577 F. Supp. 2d 105, 112 (D.D.C. 2008) ("It is the requester's obligation to articulate a public interest sufficient to outweigh an individual's privacy interest, and the public interest must be significant.") (citing *Favish*, 541 U.S. at 172).

Indeed, "[a]s a result of Exemption 7(C), . . . FOIA ordinarily does not require disclosure of law enforcement documents (or portions thereof) that contain private information," *Blackwell v. FBI*, 646 F.3d 37, 41 (D.C. Cir. 2011) (citing cases), including the names of "investigators,

suspects, witnesses, . . . informants," *Schrecker v. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003), and public employees. *Bast v. Dep't of Just.*, 665 F.2d 1251, 1254 (D.C. Cir. 1981); *accord CREW v. Dep't of Just.*, 746 F.3d 1082, 1092 (D.C. Cir. 2014). It is well-established that law enforcement personnel, witnesses, and sources have "an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were [part] of a law enforcement investigation." *Nation Magazine, Wash. Bureau v U.S. Customs Serv.*, 71 F.3d 885, 894 (D.C. Cir. 1995) (citations omitted).

When withholding information pursuant to Exemptions 6 and 7(C), the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. SUMF ¶ 44. In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. SUMF ¶ 44. When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. SUMF ¶ 44. For purposes of these exemptions, a public interest exists only when information about an individual, their name, or their identifying information would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. SUMF ¶ 44. In each instance wherein information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure. SUMF ¶ 44.

Furthermore, considering privacy concerns are typically obviated once an individual is deceased, when processing FOIA and Privacy Act requests, the FBI takes several steps to ascertain

the current life/death status of the individuals whose names are withheld. SUMF ¶ 45. The FBI

uses the birth date and/or the date of the investigation to determine whether an individual is living

or deceased, to the extent either or both of these pieces of information are discernable from the

file. SUMF ¶ 45. The date of birth is used to apply the judicially-recognized "100-year rule," i.e.,

if the individual was born more than 100 years ago, the FBI presumes that he or she is dead and

the name is released. SUMF ¶ 45. The FBI also uses institutional knowledge gained from prior

FOIA requests or internal records. SUMF ¶ 45. By using institutional knowledge, the FBI can

identify with sufficient certainty the life/death status of certain individuals. SUMF ¶ 45. If the FBI

is unable to determine the life/death status of an individual through the use of these methods, the

name of the individual is withheld pursuant to Exemptions 6 and 7(C), when it finds disclosure

would constitute an unwarranted invasion of those individuals' privacy should they still be living

and no public interest would be served in releasing the names. SUMF ¶ 45. It is also the FBI's

policy to release all names of high-ranking FBI officials in policy-making positions, as well as

individuals in public positions, as they do not have privacy rights while acting in their official

capacity. SUMF ¶ 45. This policy is applied to the individual's position at the time of the

document, and not the present. SUMF ¶ 45.

The FBI applied exemptions 6 and 7(C) to names or identifying information of seven

different groups: (1) FBI Special Agents/Professional Staff; (2) Third-Party Victims; (3) Third

Parties who Provided Information; (4) Third Parties of Investigative Interest; (5) Third Parties

Merely Mentioned; (6) Local Law Enforcement Personnel; and (7) Non-FBI Federal Government

Personnel. SUMF ¶ 46–56.

With respect to FBI special agents or professional staff, these FBI agents and professional

staff were responsible for conducting, supervising, and/or maintaining the investigation related to

FBI file 91A-IP-95252, reflected in the documents responsive to Plaintiff's request. SUMF ¶ 46 These responsibilities included, but are not limited to, the following: coordinating/completing tasks in support of the FBI's investigative and administrative functions, compiling information, conducting interviews, and/or reporting on the status of the investigation. SUMF ¶ 46

Assignments of special agents to any particular investigation are not by choice. SUMF ¶ 47. Publicity, adverse or otherwise, arising from a particular investigation and/or use of specific FBI investigative techniques, may seriously prejudice their effectiveness in conducting other investigations or performing their day-to-day work. SUMF ¶ 47. The privacy consideration is also applied to protect FBI Special agents, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations/investigative activities, whether or not they are currently employed by the FBI. SUMF ¶ 47. FBI Special agents conduct official inquiries into various criminal and national security violation cases. SUMF ¶ 47. The publicity associated with the release of a special agents' identity in connection with a particular investigation and/or investigative activities could trigger hostility toward a particular special agent. SUMF ¶ 47. During the course of an investigation, a special agent may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. SUMF ¶ 47. Persons targeted by such investigations/investigative activities, and/or those sympathetic to those targeted, could seek to inflict violence on a special agent based on their participation in an investigation and/or in the deployment of certain investigative techniques. SUMF ¶ 47. This is because an individual targeted by such law enforcement actions may carry a grudge against those involved with the investigation, which may last for years. SUMF ¶ 47. These individuals may seek revenge on special agents and other federal employees involved in a particular investigation and/or investigative activities.

SUMF ¶ 47. There is no public interest served by disclosing the special agents' identities because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. SUMF ¶ 47. Thus, disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy; and the FBI properly withheld the names and identifying information of FBI Special Agents pursuant to Exemptions 6 and 7(C). SUMF ¶ 47.

The FBI also withheld the names and identifying information of FBI professional staff pursuant to Exemptions 6 and 7(C). SUMF ¶ 48. These FBI professional staff were assigned to handle tasks related to the investigation of Plaintiff. SUMF ¶ 48. Similar to FBI special agents, these FBI employees could be targeted for reprisal based on their involvement in specific investigations/investigative activities. SUMF ¶ 48. Furthermore, these FBI professional staff were, and possibly are, in positions of access to information regarding official law enforcement investigations, and therefore could become targets of harassing inquiries for unauthorized access to investigations if their identities were released. SUMF ¶ 48. Thus, these individuals maintain substantial privacy interests in not having their identities disclosed. SUMF ¶ 48. In contrast, the FBI concluded that no public interest would be served by disclosing the identities of these FBI professional staff to the general public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. SUMF ¶ 48. Accordingly, after balancing these professional staff employees' substantial privacy interests against the non-existent public interest, the FBI determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal privacy. SUMF ¶ 48. Therefore, the FBI properly withheld the names and identifying information of FBI professional staff pursuant to Exemptions 6 and 7(C). SUMF ¶ 48.

With respect to third party victims, releasing these individuals' identities in the context of these investigative records would cause embarrassment, as well as unsolicited and unnecessary attention to be focused on these individuals. SUMF ¶ 49. Such a release could force them to relive emotionally trying events, causing further invasion of their privacy, in excess of the harms they have already been forced to endure. SUMF ¶ 49. Thus, these victims maintain strong privacy interests in the protection of such personal information. SUMF ¶ 49. Furthermore, there is no legitimate public interest to be served by releasing the identities of these victims because their identities, themselves, would not shed light on the operations and activities of the FBI. SUMF ¶ 49. The FBI determined disclosure of this information would constitute a clearly unwarranted invasion of these individuals' personal privacy, and consequently withheld this information pursuant to FOIA Exemptions 6 and 7(C). SUMF ¶ 49.

With respect to third parties who provided information, the identifying information of, and information provided by, these third-party individuals appears within the FBI's file because these individuals willingly divulged information relevant to FBI investigative efforts. SUMF ¶ 50. These individuals were not of investigative interest to the FBI. SUMF ¶ 50. Plaintiff has not provided a privacy waiver from the third-parties authorizing release of their information, nor has Plaintiff supplied proof of death; therefore, these individuals maintain substantial and legitimate privacy interests in not having their cooperation or connection to FBI law enforcement matters disclosed. SUMF ¶ 50. Considering the FBI is an investigative and intelligence agency, disclosure of these individuals' names and/or identifying information in connection with FBI records carries an extremely negative connotation. SUMF ¶ 50.

Disclosure of the identities of individuals who willingly provide information to the FBI could subject these individuals to harassment or embarrassment, undue public attention, and/or

unwanted inquiries for information related to their assistance. SUMF ¶ 51. They could also be targeted for retaliation by investigative subjects or by those who simply disparage cooperation with law enforcement. SUMF ¶ 51. Exposure of a third party's cooperation with law enforcement could also lead to legal or economic detriment, negative professional and social repercussions, possible physical harm, or even death. SUMF ¶ 51. Thus, the FBI has determined these individuals maintain substantial privacy interests in not having their identities disclosed. SUMF ¶ 51.

In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure of these individual's names and identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI. SUMF ¶ 52. The FBI concluded the non-existent public interest here was insufficient to override theses individuals' substantial privacy interests; therefore, the FBI properly protected these individuals' privacy interests pursuant to Exemptions 6 and 7(C). SUMF ¶ 52. The FBI is also relying on Exemption 7(D) to protect this information in many instances. SUMF ¶ 52.

With respect to third parties of investigative interest, being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, whether or not these individuals ever committed criminal acts. SUMF ¶ 53. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. SUMF ¶ 53. Furthermore, it could result in professional and social repercussions, due to resulting negative stigmas. SUMF ¶ 53. Accordingly, the FBI determined these individuals maintain substantial privacy interests in not having their identities disclosed. SUMF ¶ 53. In contrast, disclosing personal information about these individuals would not significantly increase the public's understanding of the FBI's performance of its mission and so the FBI concluded that there was no public interest here sufficient to override these individuals' substantial privacy

interests.  SUMF ¶ 53. For these reasons, the FBI properly withheld this information pursuant to

Exemptions 6 and 7(C).  SUMF ¶ 53.

With respect to third parties mentioned, the FBI has information about these third parties

in its files because these individuals were tangentially mentioned in conjunction with FBI

investigative efforts. SUMF ¶ 54. These individuals were not of investigative interest to the FBI.

SUMF ¶ 54. These third parties maintain substantial and legitimate privacy interests in not having

this information disclosed and thus, being connected with a FBI law enforcement matters. SUMF

¶ 54. Considering the FBI is an investigative and intelligence agency, disclosure of these third

parties' names and/or identifying information in connection with an FBI records carries an

extremely negative connotation. SUMF ¶ 54. Disclosure of their identities would subject these

individuals to possible harassment or criticism and focus derogatory inferences and suspicion on

them. SUMF ¶ 54. The FBI then considered whether there was any public interest that would

override these privacy interests, and concluded that disclosing information about individuals who

were merely mentioned in an FBI investigative file would not significantly increase the public's

understanding of the operations and activities of the FBI. SUMF ¶ 54. Accordingly, the FBI

properly protected these individuals' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

SUMF ¶ 54.

With respect to local law enforcement personnel, these employees were acting in their

official capacities and aided the FBI in the law enforcement investigation activities reflected in the

records responsive to Plaintiff's request. SUMF ¶ 55. The rationale for protecting the identities of

FBI Special Agents and professional staff discussed in Decl. of Seidel ¶¶ 61-63, applies equally to

the names and identifying information of these local law enforcement employees. SUMF ¶ 55.

Release of the identities of these law enforcement employees could subject them as individuals to

unnecessary and unwelcome harassment that would invade their privacy, and could cause them to be targeted for reprisal. SUMF ¶ 55. In contrast, disclosure of this information would serve no public interest because it would not shed light on the operations and activities of the FBI. SUMF ¶ 55. Accordingly, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C). SUMF ¶ 55.

Finally, with respect to non-FBI federal government personnel, the rationale for protecting the identities of other government employees is the same as the rationale for protecting the identities of FBI employees. SUMF ¶ 56. Publicity, adverse or otherwise, concerning the assistance of these other agency employees in an FBI investigation would seriously impair their effectiveness in assisting or participating in future FBI investigations. SUMF ¶ 56. The privacy consideration also protects these individuals from unnecessary, unofficial questioning as to the FBI investigation. SUMF ¶ 56. It is possible for a person targeted by law enforcement action to carry a grudge which may last for years, and to seek revenge on the personnel involved in the investigations at issue in these FBI records. SUMF ¶ 56. The publicity associated with the release of their names and/or identifying information in connection with these investigations could trigger hostility towards them by such persons. SUMF ¶ 56. Therefore, these employees maintain substantial privacy interests in not having their identities disclosed in this context. SUMF ¶ 56. In contrast, there is no public interest to be served by the disclosure of these employees' names and/or identifying information because their identities, by themselves, would not demonstrate how the FBI performed its statutory mission and thus, would not significantly increase the public's understanding of the FBI's operations and activities. SUMF ¶ 56. Accordingly, the FBI properly protected these employees' privacy interests pursuant to FOIA Exemptions 6 and 7(C). SUMF ¶ 56.

### c.        Exemption 7(D)

The FBI also withheld two types of information pursuant to FOIA Exemption 7(D): (1) names, identifying information of, and/or information provided by individuals under an implied assurance of confidentiality; and (2) names, identifying information of, and/or information provided by individuals under an express assurance of confidentiality. SUMF ¶¶ 57, 59–64.

FOIA Exemption 7(D) permits the withholding of "records or information compiled for law enforcement purposes" if producing the records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished" by such a source. 5 U.S.C. § 552(b)(7)(D). "Exemption 7(D) has long been recognized as affording the most comprehensive protection of all FOIA's law enforcement exemptions." *Billington v. Dep't of Just.*, 301 F. Supp. 2d 15, 21 (D.D.C. 2004) (citing *Voinche v. FBI*, 940 F. Supp. 323, 331 (D.D.C. 1996)). Exemption 7(D) does not require a balancing of public and private interests. *See, e.g., Roth v. Dep't of Just.*, 642 F.3d 1161, 1185 (D.C. Cir. 2011).

The exemption's protections also extend to the "information furnished by a confidential source" to law enforcement authorities during a criminal investigation. *See Fischer v. Dep't of Just.*, 596 F. Supp. 2d 34, 48–49 (D.D.C. 2009); *see also Parker v. Dep't of Just.*, 934 F.2d 375, 380 (D.C. Cir. 1991) ("[O]nce the agency receives information from a 'confidential source' during the course of a legitimate criminal investigation . . . *all* such information obtained from the confidential source receives protection.") (emphasis in original). Indeed, Exemption 7(D) was enacted "to assist federal law enforcement agencies" in their efforts "to obtain, and to maintain, confidential sources, as well as to guard the flow of information to these agencies." *Parker*, 934 F.2d at 380. In determining the applicability of the exemption, "the question is . . . whether the particular source spoke with an understanding that the communication would remain confidential."

*Dep't of Just. v. Landano*, 508 U.S. 165, 172 (1993); *see also Miller v. Dep't of Just.*, 872 F. Supp. 2d 12, 26 (D.D.C. 2012) (concluding that the focus should always be on whether the source of the information spoke with the understanding of confidentiality, not whether the document is generally thought to be confidential). Confidentiality exists, for the purpose of Exemption 7(D), when "the source furnished information with the understanding that the [agency] would not divulge the communication except to the extent the [agency] thought necessary for law enforcement purposes." *Miller*, 872 F. Supp. 2d at 26.

If the production of criminal investigative records "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by" such a source, that ends the matter, and the agency is entitled to withhold the records under Exemption 7(D). *Parker*, 934 F.2d at 380. Once an agency establishes the confidentiality of a source, the FOIA requester faces a heavy burden in overcoming that showing. To meet this burden, a requester must come forward with "'absolutely solid evidence showing that the source . . . in a law enforcement investigation has manifested complete disregard for confidentiality.'" *Id.* at 378 (quoting *Dow Jones & Co. v. Dep't of Just.*, 908 F.2d 1006, 1011 (D.C. Cir. 1990)).

With respect to names, identifying information of, and/or information provided by individuals under an implied assurance of confidentiality, these third parties provided information concerning the activities of subjects who were of investigative interest to the FBI. SUMF ¶ 59. Considering 1) the singularity of the information provided and the likelihood these individuals could be identified through release of this information by those familiar with the events described; 2) the proximity of these sources to the investigative subjects and events they described; 3) and the nature of the criminal acts they described, the FBI inferred these individuals provided this

information to the FBI only because they believed their cooperation with, and the information they provided, would remain confidential. SUMF ¶ 59.

The FBI protected the identifying information of, and information provided by, individuals who conveyed critical information regarding criminal acts. SUMF ¶ 60. These individuals were in a position to have ready access to and/or knowledge about investigative targets and others involved in the investigation into Plaintiff reflected in FBI File 91A-IP-95252. SUMF ¶ 60. Such access exposed them to potentially significant harms should their association and cooperation with the FBI be publicly disclosed. SUMF ¶ 60. One reason they risked harm when cooperating is they were within the orbit of suspected violent criminals, and such criminals (in the FBI's experience) typically seek to deter informants' cooperation with law enforcement through reprisal. SUMF ¶ 60. Such reprisal can take many forms, to include defamation of the source's character among their peers/family; economic reprisal (deprivation of employment/business opportunities); violent threats aimed at instilling fear and doubt; or even violence itself (physical harm/murder). SUMF ¶ 60. Considering these criminals already displayed/were believed by the sources to have a propensity towards violence, these sources likely feared violent reprisal. SUMF ¶ 60. Even amidst these potential harms, these third-party sources provided specific, detailed information that is singular in nature – i.e., only a few individuals would be privy to such information. SUMF ¶ 60. Thus, the FBI determined disclosure of the identities of these sources and the information they provided could subject these third parties, as well as their families, to retaliation or backlash, should their information be disclosed. SUMF ¶ 60.

Considering the circumstances described above, it is reasonable to infer these third parties cooperated with the FBI only because they expected their identities and the information they

provided would be held in confidence. SUMF ¶ 61. Therefore, the FBI properly protected the sources' identities and the information they provided pursuant to Exemption 7(D). SUMF ¶ 61.

With respect to names, identifying information of, and/or information provided by individuals under an express assurance of confidentiality, when processing the records at issue, the FBI found evidence these individuals, who provided specific and detailed information that is singular in nature, either requested their identities not be revealed; and/or FBI investigators would have, by standard practice, expressly promised these third parties their identities and the information they provided would remain confidential. SUMF ¶ 62.

Providing express assurances of confidentiality is essential to the FBI's ability to obtain relevant and accurate information from Confidential Human Sources ("CHSs"). SUMF ¶ 63. Without these assurances by the FBI, those with access to information critical to FBI investigations may be reluctant to provide information or may modify their statements in order to lessen the severity of any backlashes; therefore, the FBI must provide credible assurances of confidentiality to these individuals in order to obtain factual, relevant, and timely information. SUMF ¶ 63. Release of these sources' identities and/or any singular information they provided may lead to the revelation of their identities and would also display unwillingness by the FBI to honor its assurances of confidentiality to current and future CHSs. SUMF ¶ 63. Therefore, releasing this information would have a lasting negative impact on the FBI's information program – it would greatly hinder the FBI's ability to recruit and maintain CHSs willing to provide accurate and relevant information pertaining to criminal activities. SUMF ¶ 63.

In sum, the FBI located evidence certain individuals supplied information to the FBI with express assurance their names, identifying information, and the information they provided would be held in confidence. SUMF ¶ 64. Release of such information would endanger these CHSs and

cause great detriment to the FBI's ability to recruit and maintain reliable CHSs; thus, the FBI protected this information pursuant to Exemption 7(D). SUMF ¶ 64.

### d.     Exemption 7(E)

The FBI also withheld ten types of information pursuant to FOIA Exemption 7(E): (1) Bank Security Measures; (2) Information Regarding Targets, Dates, and Scope of Surveillance (e.g., location, types of devices, installation info); (3) Database Identifiers / Printouts; (4) Computer Analysis Response Team Reports and/or Data; (5) Monetary Payments for Investigative Techniques/Expenditures for Investigative Techniques; (6) Undercover Operation; (7) Information Related to Polygraphs; (8) Internal FBI Secure Telephone Number, Email Address, Internal Web Address; (9) Collection and Analysis of Information; and (10) Statistical Information Contained in Effectiveness Rating FD-515. SUMF ¶¶ 67–85.

Exemption 7(E) permits withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E); *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (noting the "relatively low bar for the agency to justify withholding" information under Exemption 7(E)).

Generally, techniques and procedures not well-known to the public have been found to be exempt from disclosure under Exemption 7(E). *See, e.g., Jud. Watch, Inc. v. Dep't of Comm.*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004) (recognizing exemption's protection for techniques "not well known to the public"). Even records containing commonly known procedures have been

protected from disclosure "if the disclosure could reduce or nullify their effectiveness." *CREW v. Dep't of Just.*, 870 F. Supp. 2d 70, 85 (D.D.C. 2012).

With respect to bank security measures, this includes details as to what security measures/technologies were/were not available to the particular banks in this investigation, where these security measures were located within the banks, and if certain surveillance security measures were active during the criminal activities described in the records. SUMF ¶ 67. Revealing this information would display for criminals the types of bank security technologies likely to be used in certain circumstances by particular banks, and how they might go about committing robberies in the banks more effectively, enabling them to avoid arrest and prosecution for the crimes. SUMF ¶ 67. This would allow them to plan future successful robberies of these and similar banks, thus enabling them to circumvent the law. SUMF ¶ 67. Therefore, this information is exempt from disclosure pursuant to Exemption 7(E). SUMF ¶ 67.

One such bank security measure described in the records at issue is bait money. SUMF ¶ 68. Bait money are treasury notes tracked by banking institutions, that if taken during bank robberies, allow law enforcement personnel to later connect the stolen money to bank robbers, whenever the robbers spend the money they stole. SUMF ¶ 68. Whenever processing this type of information, the FBI typically withholds: 1) if bait money was taken; 2) the makeup of the bait money, i.e. the monetary denominations typically used as bait money by specific institutions; and 3) the specific serial numbers of the bait money. SUMF ¶ 68. Releasing any of this information would enable bank robbers to avoid taking and or spending bait money, undermining the law enforcement purpose of this specific bank security technique. SUMF ¶ 68. As such, this information is exempt from disclosure pursuant to Exemption 7(E). SUMF ¶ 68.

Furthermore, the FBI has withheld information describing the bank surveillance system in full pursuant to Exemption (7)(E). SUMF ¶ 69. As a part of the FBI's mission as a law enforcement agency, this includes upholding and enforcing the criminal laws of the United States. SUMF ¶ 69. Bank surveillance system information within responsive documents explains the operations of the surveillance system, and it's abilities to capture footage within the bank during the robbery. SUMF ¶ 69. Accordingly, the FBI maintains its position that release of any of the information describing the bank surveillance system would provide criminals the necessary information to circumvent the very purpose of a bank surveillance system, making banks more vulnerable to bank robberies and/or other criminal activity, and therefore circumvent the law. SUMF ¶ 69.

With respect to information regarding targets, dates, and scope of surveillance (e.g., location, types of devices, installation info), the FBI utilized these surveillance operations to obtain investigative intelligence as reflected in the responsive records. SUMF ¶ 70. The law enforcement techniques used to conduct these surveillance operations are the same techniques utilized by the FBI in current criminal and national security investigations. SUMF ¶ 70. Certainly, it is publicly known the FBI and other law enforcement agencies engage in different types of surveillance in investigations. SUMF ¶ 70. However, disclosure of non-public details about who, when, how, and under what circumstances the FBI conducts surveillance would allow current and future subjects of FBI investigations and other potential criminals to develop and utilize countermeasures to defeat or avoid different types of surveillance operations, thus rendering the techniques useless to the FBI and other law enforcement agencies. SUMF ¶ 70. This is especially true because the success of investigative surveillance hinges on investigators' abilities to remain undetected. SUMF ¶ 70. Revealing any non-public details about the FBI's methodology for conducting surveillance could potentially jeopardize the FBI's ability to operate surveillance covertly, and risks circumvention

of the law. SUMF ¶ 70. Accordingly, the FBI properly asserted Exemption 7(E) to withhold this information. SUMF ¶ 70.

With respect to database identifiers and printouts, releasing the identities of these databases and any information located through queries of these databases would give criminals insight into the available tools and resources the FBI uses to conduct criminal and national security investigations (*i.e.*, the scope of information stored within the databases, how the FBI uses the databases to support its investigations, the types of information most valued by the FBI for particular investigations, and vulnerabilities of the databases). SUMF ¶ 71.

Revealing the use of these databases in the context of FBI investigative records, and the information generated through queries of these databases, would reveal the nature of their utility to FBI investigators and the scope of information stored within the databases. SUMF ¶ 72. Disclosing when and why the FBI queries these databases would reveal key information about FBI investigative strategies. SUMF ¶ 72. This is because different investigative databases contain varying datasets, and revealing the types of data sought by investigators in particular investigative circumstances would reveal the FBI strategies employed in response to different investigative circumstances. SUMF ¶ 72. Additionally, disclosing the search results for particular subjects would provide criminals with an understanding of the scope of FBI collected intelligence on particular subjects. SUMF ¶ 72. It would expose possible intelligence gaps and/or intelligence gathering strengths. SUMF ¶ 72. This would allow criminals to make informed decisions on how they might structure their behavior to exploit these strengths and weaknesses and avoid detection and/or disruption by the FBI. SUMF ¶ 72.

Revealing the types of information stored in these databases would also reveal the types of information most useful to FBI investigators. SUMF ¶ 73. This would provide criminals with an

understanding of how they might structure their behavior and/or deploy countermeasures to deprive the FBI of useful intelligence/evidence, thus jeopardizing the FBI's investigative mission. SUMF ¶ 73. Finally, revealing the identities of these databases could jeopardize the FBI's investigative mission by revealing exactly where the FBI is storing and obtaining valuable investigative data. SUMF ¶ 74. Knowing the database names makes the original source data an attractive target for compromise. SUMF ¶ 74. It would allow criminals who gain access to FBI systems an idea of where they can go to discover what the FBI knows, how it gathered the information, and possible information regarding the FBI's investigative strategies. SUMF ¶ 74. It would also offer these criminals the opportunity to corrupt or destroy information stored within these databases. SUMF ¶ 74.

In summary, release of the identities of sensitive investigative databases and database search results would impede the FBI's effectiveness and potentially aid in circumvention of valuable investigative techniques. SUMF ¶ 75. Therefore, the FBI withheld this information pursuant to Exemption 7(E). SUMF ¶ 75.

With respect to computer analysis response team reports and/or data, the FBI's Computer Analysis Response Team ("CART") provides digital forensics, technical capabilities, and related services and support to the FBI, intelligence organizations and other law enforcement agencies. SUMF ¶ 76. CART provides support to investigations that are reliant, in whole or in part, upon digital evidence, namely through the acquisition, preservation, examination processing, and presentation of digital information stored in computers or other electronic devices or media. SUMF ¶ 76. CART analyzes a variety of digital media, including, but not limited to, desktop and laptop computers, Compact Disks ("CDs")/Digital Video Disks ("DVDs"), cell phones, digital cameras, digital media players, flash media, and other digital media storage devices. SUMF ¶ 76. CART

examiners are experts at extracting data from digital media. SUMF ¶ 76. Providing detailed information about CART software, equipment, techniques, procedures, and/or types of reports generated by CART during their forensic testing processes would impede the FBI's effectiveness in investigating crimes where evidence can be found on computers and other digital media. SUMF ¶ 76. It would also aid in circumvention of the law by providing criminals the information necessary for them to adjust behavior to avoid detection, develop and/or utilize technology less susceptible to law enforcement detection or scrutiny, and/or use or develop technology to counteract techniques used by CART. SUMF ¶ 76. Accordingly, the FBI properly withheld this information pursuant to Exemption 7(E). SUMF ¶ 76.

With respect to monetary payments for investigative techniques/expenditures for investigative techniques, the FBI has limited resources that it must allocate strategically to effectively pursue its law enforcement and intelligence gathering missions. SUMF ¶ 77. Revealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts. SUMF ¶ 77. Revealing this level of focus would reveal how the FBI plans to allocate its limited resources and essentially paint a picture as to where the FBI's strengths and weaknesses lie within the spectrum of illegal activities it is mandated to investigate. SUMF ¶ 77. Releasing this information would give criminals the opportunity to structure their activities in a manner which avoids the FBI's strengths and exploits its weaknesses. SUMF ¶ 77. Because release of this type of information would enable criminals to circumvent the law, this information has been redacted pursuant to Exemption 7(E). SUMF ¶ 77.

With respect to undercover operation, the FBI relies on undercover operations as a useful investigative technique to conduct investigations. SUMF ¶ 78. Although it is publicly known the

FBI conducts undercover operations, the specific details of particular operations are not known. SUMF ¶ 78. Secrecy and discretion are essential when conducting effective undercover operations; therefore, publicizing details concerning unknown FBI undercover investigative techniques and the FBI's operational security methods during these undercover operations is counterintuitive. SUMF ¶ 78. If the FBI were to disclose these non-public details about how it conducts undercover operations and release details of the specific techniques used during this undercover operation, it could have devastating operational consequences and would jeopardize future use of undercover operations by the FBI in similar cases or under similar circumstances; thus, disclosure of these details would hinder the FBI's use of a valuable investigative technique and risk circumvention of the law. SUMF ¶ 78. Accordingly, the FBI properly asserted FOIA Exemption 7(E) to protect this type of information. SUMF ¶ 78.

With respect to information related to polygraphs, while the FBI's use of polygraph examinations is publicly known, the details of the FBI's methodology for conducting polygraphs is highly guarded information. SUMF ¶ 79. Disclosure of this information could enable individuals subject to polygraph examinations – including applicants, employees, and individuals involved in law enforcement investigations – to educate themselves about pre-employment and operational polygraph examinations and develop countermeasures to circumvent the effectiveness of the examinations. SUMF ¶ 79. For example, revealing the types of questions asked during certain types of polygraphs would allow examinees to prepare their answers ahead of time, and practice hiding their deception from polygraphers. SUMF ¶ 79. Furthermore, revealing any details of how polygraphers administer polygraphs and interpret polygraph results would allow examinees an idea of how they might effectively deceive FBI polygraphers, and circumvent the law enforcement purpose of polygraph examinations. SUMF ¶ 79. In this manner, the relative benefit of polygraph

examinations would be diminished by disclosure of the actual techniques and procedures employed by the FBI. SUMF ¶ 79. Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption 7(E). SUMF ¶ 79.

With respect to internal FBI secure telephone numbers, email addresses, and internal web addresses, releasing this information would provide criminals with specific targets for possible cyber-attacks and/attacks on FBI secure communications. SUMF ¶ 80. Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system. SUMF ¶ 80. It is possible they could use this information to gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications. SUMF ¶ 80. Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law. SUMF ¶ 80. Accordingly, the FBI asserted Exemption 7(E) to withhold this information. SUMF ¶ 80.

With respect to the collection and analysis of information, the release of this information would disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodologies employed to analyze it once collected. SUMF ¶ 81. Such disclosures would enable subjects of FBI investigations to circumvent similar currently used techniques. SUMF ¶ 81. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. SUMF ¶ 81. This in turn would facilitate the accumulation of information by investigative subjects regarding the

circumstances under which the specific techniques were used or requested and the usefulness of the information obtained. SUMF ¶ 81. Release of this type of information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities. SUMF ¶ 81. Accordingly, the FBI has properly withheld this information pursuant to FOIA Exemption 7(E). SUMF ¶ 81.

Finally, with respect to statistical information contained in effectiveness rating FD-515, FD-515's are forms used by FBI personnel to report investigative accomplishments. SUMF ¶ 82. FD-515s are submitted at various stages of an investigation to report statistically important events such as an arrest, conviction, sentencing, asset seizure, and disruption/dismantlement of a criminal enterprise. SUMF ¶ 82. The FBI withheld three types of information in FD-515s pursuant to Exemption (E): a) statistical data concerning investigative assistance and techniques used; b) information concerning the assistance of other agencies; and c) subject description codes. SUMF ¶ 82.

The FBI asserted Exemption 7(E) to protect from disclosure statistical information concerning effectiveness ratings assigned to various FBI investigative techniques. SUMF ¶ 83. The FBI gives a numerical rating evaluating the effectiveness of each technique/assistance used in bringing an investigation to a successful conclusion. SUMF ¶ 83. The entire rating column has been deleted to protect from release the various techniques and assistance used in the investigation. SUMF ¶ 83. If the rating columns were released along with the ratings of each technique and assistance used, others involved in similar criminal activities could change their methods and modus operandi in order to circumvent and avoid detection and/or disruption by FBI investigators,

through the use of these techniques, in the future. SUMF ¶ 83. The protection of these rating columns is essential to prevent future circumvention of the law by criminals. SUMF ¶ 83. Therefore, the FBI properly protected this information pursuant to FOIA Exemption 7(E). SUMF ¶ 83.

Additionally, the FBI asserted Exemption 7(E) to withhold the "Assisting Agencies" portions of the FD-515s within the responsive records. SUMF ¶ 84. This was done to neither confirm nor deny if any other federal, state, or local agencies assisted the FBI in law enforcement activities. SUMF ¶ 84. This is standard RIDS processing policy for all FD-515 Accomplishment Reports and associated documents. SUMF ¶ 84. Affirmatively acknowledging which law enforcement agencies (whether state, local, or federal) assisted the FBI in its investigative efforts of the subjects of FD-515s risks confirming unknown investigative interests of other law enforcement agencies by revealing these other agencies' interests in the subject. SUMF ¶ 84. Such revelations would allow subjects to predict law enforcement actions, modify their behavior in a manner which avoids the investigative efforts of law enforcement, and enable them to circumvent the law. SUMF ¶ 84. Furthermore, if this portion of the FD-515 is blank, thus revealing no other agencies assisted the FBI, criminals would be able to discern if some of their criminal behaviors have gone undetected. SUMF ¶ 84. Release of this information risks emboldening such criminals to continue undetected criminal activities. SUMF ¶ 84. It would also allow them to judge law enforcement agencies' strengths and weaknesses in regard to detecting/disrupting particular criminal activities; structure their activities to exploit this knowledge; and successfully evade law enforcement agencies' efforts to enforce the law. SUMF ¶ 84. Accordingly, only by employing the practice of always redacting this portion of FD-515s is the FBI able to avoid the substantial

law enforcement circumvention risks enumerated above; thus, the FBI properly withheld this information pursuant to FOIA Exemption 7(E). SUMF ¶ 84.

Finally, the FBI applied Exemption 7(E) to protect assigned "Subject Description Codes." SUMF ¶ 85. A total listing of these codes is typically attached to FD-515s. SUMF ¶ 85. Revealing an assigned code in conjunction with the individual indicted/arrested/convicted would immediately describe the nature of FBI's gathered criminal intelligence on the individual, and the level of the FBI's investigative focus. SUMF ¶ 85. This would enable criminals to determine whether or not the FBI has detected particular criminal activities, enabling them to preemptively destroy other incriminating evidence, and/or embolden them to continued undetected criminal activities. SUMF ¶ 85. For example, if the FBI labeled someone convicted of a crime as an "8A – All Other Subjects," it would be very telling should this person actually be the boss of a criminal enterprise. SUMF ¶ 85. This individual would be able to judge the FBI does not know the totality his/her criminal activities. SUMF ¶ 85. Furthermore, if a criminal is convicted of money laundering crimes but is labeled as a "4A – Known Member of a Terrorist Organization," the individual would know the FBI is investigating them for additional criminal activities that may or may not have been publicly disclosed. SUMF ¶ 85. This would enable this person to preemptively cut ties with their terrorist associates and destroy incriminating evidence to avoid further prosecution. SUMF ¶ 85. In sum, the FBI determined releasing subject description codes would enable criminals to discern FBI investigative focuses and the nature of its gathered criminal intelligence, enabling them to predict and thwart FBI investigative efforts; and enable them to circumvent the law. SUMF ¶ 85. Thus, the FBI asserted FOIA Exemption 7(E) to protect this information with FD-515 forms as well. SUMF ¶ 85.

## 2.   ATF'S Application of FOIA Exemption 6 and 7

Based on the FBI's consultation with ATF, ATF also requested that information be protected pursuant to FOIA Exemption (b)(6) and (b)(7)(C). SUMF ¶ 97. Specifically, exemptions (b)(6) and (b)(7)(C) have been asserted to protect the names and/or identifying information of ATF Special Agents and support personnel who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in the documents responsive to Plaintiff's request. SUMF ¶ 100. Publicity (adverse or otherwise) regarding any particular investigation to which they have been assigned may seriously prejudice their effectiveness in conducting other investigations. SUMF ¶ 100. The privacy consideration is also to protect ATF Special Agents and support personnel, as individuals, from unnecessary, unofficial questioning as to the course of an investigation, whether or not they are currently employed by ATF. SUMF ¶ 100.

ATF Special Agents conduct official inquiries into violations of various criminal statutes. SUMF ¶ 101. They encounter all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. SUMF ¶ 101. It is possible for an individual targeted by such law enforcement actions to carry a grudge which may last for years, and to seek revenge on the agents involved in a particular investigation. SUMF ¶ 101. The publicity associated with the release of an agent's identity in connection with a particular investigation could trigger hostility toward a particular agent. SUMF ¶ 101. There is no public interest to be served by disclosing the identities of the Special Agents to the public. SUMF ¶ 101. Thus, disclosure of this information would constitute a clearly unwarranted invasion of personal privacy and could reasonably be expected to constitute an unwarranted invasion of their personal privacy. SUMF ¶ 101. All redactions made pursuant to Exemptions 6 and 7(C) were applied narrowly to ensure the release of as much information as possible. SUMF ¶ 102.

**3.      EOUSA'S Application of FOIA Exemption 6 and 7**

Based on the FBI's consultation with EOUSA, EOUSA also requested that information be protected pursuant to FOIA Exemption (b)(6) and (b)(7)(C). SUMF ¶ 103. Specifically, the information being protected from public disclosure consists of Department of Justice employee names, third-party signatures, personal addresses, and investigatory information alluding to perceived criminal activity. SUMF ¶ 107. Such information provides more insight into third-party activities than government activities. SUMF ¶ 107. There has been no showing of public interest in the records requested. SUMF ¶ 107. A "personal stake in using the requested records to attack [a] conviction [ ] does not count in the calculation of the public interest." *McRae v. Dep't of Just.*, 869 F. Supp. 2d 151, 166 (D.D.C. 2012). SUMF ¶ 107. While Plaintiff is entitled to request records pertaining to himself or the government via FOIA, EOUSA is not permitted to release third party information, absent express consent from said third party. SUMF ¶ 107.

For purposes of both Exemptions 6 and 7(C), the information that is being withheld consists of Department of Justice employee names, third-party signatures and other personally identifiable information compiled for law enforcement purposes. SUMF ¶ 108. Public identification of government personnel involved in the criminal investigation could subject them to harassment both in the conduct of their official duties and their private lives. SUMF ¶ 109. Similarly, individuals- whether targets, suspects, or witnesses- have a strong interest in not being unfairly associated publicly with alleged criminal activity. SUMF ¶ 109. The mention of a private individual's name in a law enforcement file, or in email communication regarding an investigation, engenders comment and speculation and could produce an unfair stigma which could expose the individual to harassment or criticism. SUMF ¶ 109. These individuals also have a substantial privacy interest in avoiding disclosure of their personal information in the requested documents.

SUMF ¶ 109. For purposes of both Exemption 6 and 7(C), the release of personally identifiable information could subject the individuals to an unwarranted invasion of their personal privacy by leading to efforts to contact them directly, gain access to their personal information, or subject them to harassment or harm. SUMF ¶ 109. There is no countervailing public interest that warrants the release of an individual's personally identifiable information, and its dissemination would not help explain the government's activities or operations. SUMF ¶ 109. The need to protect an individual's privacy rights far outweighs any public need for the disclosure of the personally identifiable information. SUMF ¶ 109. Even a diminished privacy interest would outweigh the absence of any cognizable public interest identified by Plaintiff. SUMF ¶ 109.

### 4.    USMS' Application of FOIA Exemption 6 and 7

Based on the FBI's consultation with the U.S. Marshals Service ("USMS"), USMS also requested that information be protected pursuant to FOIA Exemption (b)(6) and (b)(7)(C), (7)(E), and (7)(F). SUMF ¶ 88. With respect to FOIA Exemptions 6 and 7(C), USMS withheld names and other identifying information of USMS's law enforcement officers and professional staff. SUMF ¶ 91. Specifically, in the records at issue, USMS protected names, signatures, phone numbers, and emails of USMS employees. SUMF ¶ 91. The disclosure of this identifying information contained in records compiled for law enforcement purposes could subject USMS law enforcement officers and professional staff to harassment and unwelcome contact. SUMF ¶ 91. This could disrupt and impede official agency activity, as well as endanger the safety of USMS personnel. SUMF ¶ 91. USMS employees have a privacy interest in not being publicly associated with law enforcement investigations and related proceedings. SUMF ¶ 91.

The disclosure of identifying information pertaining to USMS law enforcement officers and professional staff in connection with a particular investigation could trigger hostility toward

USMS personnel. SUMF ¶ 92. Individuals targeted by investigations and related proceedings could seek to harass or threaten USMS personnel based on the USMS's employee participation in an investigation. SUMF ¶ 92. In the records at issue, there is no public interest served in releasing names and other identifying information of USMS personnel because disclosure of such information would not shed light on USMS's performance of its statutory duties. SUMF ¶ 92. In other words, the release of names and other identifying information pertaining to USMS employees would not significantly increase the public's understanding of the USMS's mission. SUMF ¶ 91. As there is no discernable FOIA public interest in the disclosure of these names and other identifying information, the balancing test weighs in favor of non-disclosure. SUMF ¶ 92. Accordingly, the identifying information pertaining to USMS employees is properly withheld pursuant to FOIA Exemptions 6 and 7(C). SUMF ¶ 92.

The USMS also withheld pursuant to FOIA Exemptions 6 and 7(C) personally identifiable information pertaining to third parties. SUMF ¶ 93. The disclosure of third-party information could constitute an unwarranted invasion of personal privacy and subject these individuals to embarrassment, harassment, and undue public attention. SUMF ¶ 93. Individuals have a recognized privacy interest in not being publicly associated with law enforcement investigations, and not being associated unwarrantedly with alleged criminal activity. SUMF ¶ 93. Release of such information could also result in professional and social repercussions due to the resulting negative stigma of being associated with a law enforcement investigation or alleged criminal activity. SUMF ¶ 93. Accordingly, these individuals maintain a substantial privacy interest in not having their identifying information disclosed. SUMF ¶ 93. In contrast, the release of this type of information would not shed light on USMS's performance of its statutory duties. SUMF ¶ 93. Thus, USMS concluded that the public interest does not outweigh these individuals' substantial

privacy interests in the non-disclosure of their personally identifiable information. SUMF ¶ 93. Therefore, USMS correctly withheld this information pursuant to FOIA Exemptions 6 and 7(C). SUMF ¶ 93.

With respect to FOIA Exemption 7(F), the disclosure of the identities of USMS law enforcement officers and personnel contained in records compiled for law enforcement purposes could subject these individuals to harassment and unwelcome contact. SUMF ¶ 94. This could disrupt and impede official agency activity, as well as endanger the safety of USMS law enforcement officers and personnel. SUMF ¶ 94. For these reasons, USMS correctly applied FOIA Exemption 7(F) in conjunction with FOIA Exemptions 6 and 7(C) to withhold the identities of law enforcement officers and personnel. SUMF ¶ 94.

Finally, with respect to FOIA Exemption 7(E), this exempts from release information that would disclose law enforcement techniques and procedures, the disclosure of which could reasonably be expected to risk circumvention of the law. SUMF ¶ 95. Public disclosure of information such as internal codes and internal identifying numbers could assist unauthorized parties in deciphering the meaning of the codes and numbers, aid in gaining improper access to law enforcement databases, and assist in the unauthorized party's navigation of these databases. SUMF ¶ 95. This disclosure of techniques for navigating the databases could permit people seeking to violate the law to gain sensitive knowledge and take preemptive steps to counter actions taken by law enforcement during investigatory operations. SUMF ¶ 95. The disclosure of this information serves no public benefit and would not assist the public in understanding how the agency is carrying out its statutory responsibilities. SUMF ¶ 95. USMS released all reasonably segregable, non-exempt information contained within the records at issue. SUMF ¶ 96. In preparing its declaration, USMS conducted an additional review of the information that was

previously released to Plaintiff. SUMF ¶ 96. Upon further review, USMS determined that information, previously withheld by USMS, can now be released to Plaintiff. SUMF ¶ 96. USMS is attaching the pages where supplemental releases have been made with respect to the first consult as Exhibit 3, and the supplemental releases made with respect to the second consult as Exhibit 4. SUMF ¶ 96. USMS's decision to release this information is further proof of USMS's effort to segregate the material at issue. SUMF ¶ 96.

## III.   DEFENDANTS RELEASED ALL RESPONSIVE, NON-EXEMPT, SEGREGABLE RECORDS

Under FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b). Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions." *Mead Data*, 566 F.2d at 260. To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Just.*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

As explained in the agency declarations, Defendants carefully reviewed each responsive record on a page by page and line by line basis to identify reasonably segregable, non-exempt information. SUMF ¶¶ 96, 102, 110. All the information withheld by Defendants was exempt from disclosure pursuant to FOIA exemptions. *Id.* Defendants determined that no further segregation of meaningful information in the page or portions of pages withheld is possible without disclosing

information that warrants protection under the FOIA. SUMF ¶ 30, 96, 102, 110–112. All the information not exempted from disclosure pursuant to the FOIA exemptions specified above was correctly segregated, and non-exempt portions were released. *Id.* Defendants have released all non-exempt records responsive to the Plaintiff's FOIA request in accordance with the requirements of the FOIA. *Id.*

Based on the foregoing, Defendants have met their burden with respect to demonstrating that they released all responsive, non-exempt, reasonably-segregable records.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that they should be granted summary judgment with respect to their response to Plaintiff's FOIA request.

Dated:  April 26, 2022
       Washington, DC

                                       Respectfully submitted,

                                       MATTHEW M. GRAVES, D.C. Bar #481052
                                       United States Attorney

                                       BRIAN P. HUDAK
                                       Chief, Civil Division

                                    By:       */s/ Blake A. Weiner*
                                          Blake A. Weiner
                                        Assistant United States Attorney
                                        Civil Division
                                        601 D Street, N.W.
                                        Washington, D.C. 20530
                                        (202) 803-1604
                                        blake.weiner@usdoj.gov

                                       *Attorneys for the United States of America*